Not For Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - -
IN RE:                             )        CASE NO.        09-31938 (LMW)
                                   )
  MICHAEL DEPINNA and              )        CHAPTER        13
  KAREN DEPINNA,                   )
                                   )
      DEBTORS.                     )
- - - - - - - - - - - - - - - - - - - - - - -
  MARY SCHEPPERLEY and             )        ADV. PRO. NO.    09-3088
  MARY DYKAS,                      )
                                   )
      PLAINTIFFS                   )        ECF NO.        16
          vs.                      )
                                   )
  MICHAEL DEPINNA and              )
  KAREN DEPINNA,                   )
                                   )
      DEFENDANTS.                  )
- - - - - - - - - - - - - - - - - - - - - - -

## APPEARANCES

Charles F. Brower, Esq.              Attorneys for Plaintiffs
Marcus G. Organschi, Esq.
Robert A. D'Andrea, Esq.
Brower, Organschi & D'Andrea, LLP
445 Prospect Street
Torrington, CT 06790

Anthony R. Minchella, Esq.           Attorney for Defendants/Debtors
Minchella & Associates, LLC
530 Middlebury Road, Ste. 209B
Middlebury, CT 06762

## MEMORANDUM OF DECISION

Lorraine Murphy Weil, Chief United States Bankruptcy Judge

The matter before the court is the above-referenced plaintiffs'[1] Amended Complaint (ECF No. 16, the "Amended Complaint")[2] against the Debtors alleging that a certain state-court judgment (the "State Court Judgment") in the approximate amount of $196,520.00 is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).[3]  This court has jurisdiction over this proceeding as a core proceeding under 28 U.S.C. §§ 157 and 1334 and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[4]

This memorandum constitutes the findings of fact and conclusion of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.   BACKGROUND

### A.   Chapter 13 Case

The Debtors commenced this Chapter 13 case by a petition filed on July 17, 2009. Contemporaneously with the filing of the petition, the Debtors filed their schedules and statement of

---

[1]   Mary Dykas ("Sister") is the daughter of Mary Schepperley (and sister of Karen Depinna) and has brought this action as her mother's attorney-in-fact.  As used hereinafter, the term the "Plaintiffs" is used to refer to the two named plaintiffs collectively.  Mary Schepperley hereafter is referred to as "Mother."  Debtor Karen DePinna hereafter is referred to as "Karen."  Debtor Michael DePinna hereafter is referred to as "Michael."  Karen and Michael are hereafter referred to collectively as the "Debtors."

[2]   References herein to the docket of this adversary proceeding appear in the following form: "ECF No. __."  References herein to the docket of the above-referenced Chapter 13 case appear in the following form: "Case ECF No. __."

[3]   The original complaint (ECF No. 1, the "Original Complaint") cited generally to 11 U.S.C. § 523(c) without any reference to subsection(s) of Section 523(a).  The Amended Complaint relies exclusively on Section 523(a)(2) in its prayer for relief.  (*See* ECF No. 16 at 9.) However, the Pretrial Order submitted, served and entered in this proceeding alludes to Section 523(a)(4) but not to Section 523(a)(2).  (*See* ECF No. 12.)  The parties have treated this proceeding as arising under Section 523(a)(2) *and* Section 523(a)(4), and the court will do the same.

[4]   That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

financial affairs.  (*See* Case ECF No. 1.)  On their schedules, the Debtors listed the following assets:

joint title to a single family home at 30 North Mark Drive, Oxford, CT (the "House") with a stated value

of $451,000.00; joint title to a time share at "Las Olas Beach Club" with a stated value of $9,000.00;

and personal property (some joint, some not) with a stated aggregate value of $130,211.00.  (*See id.*)

On their schedules, among other secured claims the Debtors listed: a first mortgage on the House

in favor of Countrywide Home Loans ("Countrywide") in the amount of $305,512.00 (the "Countrywide

First Mortgage"); a second mortgage (the "Countrywide Second Mortgage", collectively with the

Countrywide First Mortgage, the "Countrywide Mortgages") on the House in favor of Countrywide in

the amount of $97,042.00; a "3rd [m]ortgage" (the "Valley Bank Subordinated Mortgage") on the

House in favor of Valley Bank in the amount of $38,000.00; and a judicial lien (listed as undisputed,

the "Judgment Lien") securing the State Court Judgment in the amount of $196,000.00 (listed as

unsecured to the extent of $185,554.00).  (*See* Case ECF No.1.)  The Debtors also listed joint unsecured

priority claims (none disputed) in the amount of $50,000.00.  (*See id.*)  The Debtors further listed

general unsecured claims (some joint and some not and none disputed) in the aggregate amount of

$83,895.00.  (*See id.*)  The Debtors claimed various exemptions in property, including an exemption

under 11 U.S.C. §§ 522(b) and 522(d)(1) with respect to the House.  (*See id.*)  On their Schedule I

(Current Income of Individual Debtors), (a) Michael listed his occupation as an "Electrical Engineer"

who had been employed by Conveyco for six years as of the petition date,[5] (b) Karen stated that she had

---

[5]     Michael holds a "master contractor's license," (ECF No. 57 at 20:13-16 (Michael's testimony)).  It is not known to the court whether the foregoing is a type of electrical contractor's license or refers to something else.  Michael also has an Associate's Degree in electrical engineering and has significant construction experience.  (*See* 11/20/08 S.C. Tr. (as hereafter defined) at 93:5-7 (Michael's testimony).)

been employed by "The Hartford" in some unspecified position for eight years as of the petition date,[6]

and (c) the Debtors aver (as of the petition date) aggregate net monthly take home pay in the amount

of $8,668.00. (*See* Case ECF No. 1.)  On their Schedule J (Current Expenses of Individual Debtors),

the Debtors aver average aggregate monthly expenses in the amount of $6,873.00. (*See id.*)  At least

from the time of the Debtors' marriage, Karen's autistic son (19 years old as of the petition date) from

a prior marriage lived with the Debtors. (*See id; see also* ECF No. 57 at 39:11-19 (Karen's testimony).)

On September 2, 2009, the Debtors amended their Schedule F to include additional "Joint

Business Debt" in the aggregate amount of $39,841.29. (*See* Case ECF No. 29.)  On October 27, 2009,

after notice and a hearing (and without objection) an order entered avoiding the Judgment Lien pursuant

to 11 U.S.C. § 522(f). (*See* Case ECF Nos. 28, 36.)  Nevertheless, on or about November 13, 2009, the

Chapter 13 trustee (the "Trustee") filed a proof of secured claim in the name of the Plaintiffs in the

amount of $196,000.00 with respect to the Judgment Lien. (*See* Claims Register (Claim No. 24-1).)

The Plaintiffs did not file their own proof of claim. (*See* Claims Register.)  The Trustee also filed a

proof of secured claim in the amount of $3,000.00 in the name of Valley Bank for "mortgage arrearage"

(presumably with respect to the Valley Bank Subordinated Mortgage). (*See* Claims Register (Claim

No. 23-1).)

On September 4, 2009, the Debtors filed a "1ˢᵗ Amended Chapter 13 Plan." (*See* Case ECF

No. 31, the "Plan.")  Among other things, the Plan proposes to make monthly payments to the Trustee

in the amount of $1,193.00 for 60 months. (*See id.*)  The Plan proposes distributions to priority and

secured creditors. (*See id.*)  The Plan proposes to treat the State Court Judgment debt as a general

unsecured claim. (*See id.; see also* Case ECF No. 36.)  Unless the "estate is found to be solvent," the

---

[6]      As of the S.C. Trial, Karen had worked for eight years doing paralegal work. (*See* 11/19/08 S.C. Tr. (as hereafter defined) at 43:14–18 (Karen's testimony).)

Plan proposes that no distributions be made to the class of the holders of general unsecured claims. (*See* Case ECF No. 31 at 2.) Confirmation proceedings in respect of the Plan have been continued on several occasions and, as of the date hereof, remain pending.[7]

### B.    Adversary Proceeding

This adversary proceeding was commenced by the filing of the Original Complaint on October 18, 2009. The Amended Complaint was filed on December 4, 2009. Very broadly put, the Amended Complaint alleges that the State Court Judgment debt is nondischargeable under 11 U.S.C. § 523 because the judgment arose out of a scheme by the Debtors to use Mother's money to build a new home (*i.e.,* the House) for themselves and/or otherwise to misappropriate Mother's money under the pretext of building an apartment (the "Apartment") in the House for Mother. The Debtors' "Answer and Affirmative Defenses" was filed on December 31, 2009. (*See* ECF No. 29.) The "Answer and Affirmative Defenses" alleged two affirmative defenses: that the Plaintiffs' claims "are barred by the doctrine of collateral estoppel, as the issues have been actually litigated and finally determined by the Connecticut Superior Court,"(ECF No. 29 at 5); and that Plaintiffs' claims "fail to state a claim upon which relief can be granted," (*id.*). The Plaintiffs filed a "Reply to Affirmative Defenses" denying the referenced affirmative defenses. (*See* ECF No. 31.)

The Amended Complaint came on for trial (the "Trial") on February 9, 2010. By stipulation of the parties, transcripts of the S.C. Trial (as hereafter defined) and exhibits admitted into evidence at the S.C. Trial were admitted into evidence at the Trial. (*See* ECF No. 57 at 6-7.)[8] The parties also agreed

---

[7]    If at all, discharge is granted in a chapter 13 case only after confirmation of a chapter 13 plan, either upon full consummation of such chapter 13 plan or on a so-called "hardship" basis. *See* 11 U.S.C. § 1328.

[8]    Those transcripts and exhibits comprise two full binders. The court deems the contents of those binders in their entirety to constitute full exhibits in this adversary proceeding. At the Trial, the court admonished the parties as follows:

that certain documents would be admitted post-trial: a further decision (ECF No. 46 (attached "Order"

dated March 16, 2009, the "Interest Order"))[9] by the Superior Court awarding prejudgment interest on

the State Court Judgment in the amount of $16,520.00; a subsequent decision (ECF No. 61

(attachment), the "Stay Decision") of the Superior Court granting the Plaintiffs partial relief from the

state-law automatic stay pending appeal; and a transcript of Mother's deposition testimony taken on

September 25, 2008 in connection with the Superior Court action (the "State Court Action") (*see* ECF

No. 71).

Both sides introduced additional exhibits into evidence at the Trial by stipulation. (*See* ECF No.

57 at 6.)[10]  The Debtors testified for themselves at the Trial, and Mother testified for the Plaintiffs.  At

the conclusion of the Trial, the court took the matter under advisement subject to supplementation of

---

Just . . . as a warning to counsel, with respect to the transcripts, although I usually do read the transcripts in toto, I do reserve the right not to.  So if . . . you want me to look at something in the transcripts, please cite to it specifically. [T]hen I . . . will be obligated to look at the transcript.  I can look at other parts of the transcripts and use them if I want.

(ECF No. 57 at 8 (remarks by the court).)  The court has taken the same approach with respect to the S.C. Trial exhibits.

[9]      In all other respects, ECF No. 74 is treated as having superceded ECF No. 46.

[10]      A transcript of the Trial appears in the record as ECF No. 57.  Citations to the transcripts from the State Court Action trial (the "S.C. Trial") appear in the following form:  "____ S.C. Tr.  at ____:  ___."  Except with respect to the Interest Order, the Stay Decision and ECF No. 71, references to the Trial exhibits appear as follows:  for the Plaintiffs' exhibits - "Plaint. Exh.  __;" and for the Debtors' exhibits - "Debtor Exh.  __."

the record (as aforesaid) and post-trial briefing.  Post-trial briefing[11] and supplementation is complete

and the matter is ripe for written disposition.[12]

## II.    FACTS

Mother was born on March 3, 1936.  (*See* ECF No. 16 at 1; ECF No. 29 at 1.)  Mother had a

stroke in May of 2004.  (*See* ECF No. 57 at 63:4 (Mother's testimony).)  The stroke left Mother with

some physical impairments to her left side and some memory issues.  (*See* 11/19/08 S.C. Tr. at 122:10-

15 (Mother's testimony).)  After a brief stay in the hospital and in a rehabilitation facility (*see id.* at

112:11-17 (Mother's testimony)), in July of 2004 Mother took up residence at Sunrise Assisted Living

("Sunrise") in West Babylon, New York (*see* ECF No. 57 at 63:5 (Mother's testimony); *see id.* at

112:18 (Mother's testimony)).  Mother's son John Kier ("Brother") selected Sunrise and installed

Mother there*.  (See* ECF No. 57 at 87:23 (Karen's testimony).)  Mother testified at the Trial that she

"loved" it at Sunrise.  (*See* ECF No. 57 at 68:18-19 (Mother's testimony).)  However, Mother testified

at the S.C. Trial that she had become tired of communal living.  (*See* 11/19/08 S.C. Tr. at 125:7-10

(Mother's testimony).)  Karen also testified at the S.C. Trial that Mother was unhappy at Sunrise

because she was so much younger than the rest of the residents.  (*See* 11/21/08 S.C. Tr. at 8:18-25

(Karen's testimony).)

For five months prior to having the stroke, Mother lived with Brother in Long Island, New York

at his house.  (*See* 11/19/08 S.C. Tr. at 107:8-10, 108:21-22 (Mother's testimony).)  Prior to that,

---

[11]    On February 1, 2011, with the Debtors' consent the Plaintiffs filed amended briefs (*see* ECF Nos. 74, 75) solely to correct a technical problem with the prior versions.  (*Cf.* ECF No. 72.)

[12]    On June 15, 2010, the Debtors filed that certain Defendants' First Motion for Leave To Amend and File First Amended Answer and an Attorneys Fees Affidavit of Anthony R. Minchella.  (*See* ECF Nos. 60, 62.)  The motion sought "leave to amend their complaint [sic] to add a counterclaim for attorney's fees pursuant to 11 U.S.C. § 523(d)," (ECF No. 60 ¶ 5).  The motion was denied by order dated July 22, 2010 "without prejudice," (ECF No. 69).

Mother lived by herself in a house in West Babylon; she sold her house in late 2003. (*See id.* at 82:14-27 (Mother's testimony).) While Mother was living with Brother, she, Brother and his wife discussed a plan to build an apartment for Mother in the lower (split) level of his house. (*See id.* at 109:2–110:1 (Mother's testimony).) Until she had the stroke, Mother still was working full time as a recreational therapist at a nursing home. (*See id.* at 107:16–108:20 (Mother's testimony).)

Mother received approximately $300,000.00 in net proceeds from the sale of her former home. (*See* ECF No. 57 at 82:22-25 (Mother's testimony).) Those sale proceeds went into a savings account (the "Astoria Bank Savings Account") with Astoria Federal Savings Bank ("Astoria Bank"). (*See* Plaintiff Exh. HH.) For many years, Mother maintained a joint checking account with Karen at Astoria Bank (the "Astoria Bank Checking Account") and Bank of America. (*See* ECF No. 16 at 2; ECF No. 29 at 2.) The Astoria Bank Savings Account also was held jointly by Mother and Karen. (*See* Plaintiff Exh. HH; ECF No. 57 at 45:9-12 (Karen's testimony).) For some period after her stroke, Mother continued to write checks on her accounts and keep track of her finances. (ECF No. 57 at 71:1-6 (Mother's testimony).) However, in October of 2004, Karen "took over" that function for Mother "because . . . [Karen] realized that [Mother] wasn't handling it well and . . . [Karen] took it over to help . . . [Mother]." (11/19/08 S.C. Tr. at 160:25–161:1 (Mother's testimony).)

During the latter half of 2004, Karen began to be concerned about Mother's finances. Karen suggested to Mother that "you're not making anything on your money, and Mike has a place up here in Connecticut and he's doing well with his, what if we take some of your money [from the Astoria Savings Account] and put it in that bank," (ECF No. 57 at 69:21–70:1 (Mother's testimony)). Mother agreed to the foregoing. (*See* Debtor Exh. 1 at tab 24 ¶ 4 (Mother's Affidavit).) As a result, $100,000.00 was transferred from the Astoria Bank Savings Account to a joint money market account (between Mother and Karen) (the "Charter Money Market Account") at Charter One Bank

(subsequently known as Citizens Bank of Connecticut, "Citizens Bank") on or about October 12, 2004.

(*See* Plaintiff Exhs. HH, II.)[13]  Karen also opened a joint checking account with Mother (the "Citizens

Account") at Citizens Bank.[14]  (*See* Plaintiff Exh. HH.)

Karen also began to worry that Mother (who was only 68 years old at the time) would outlive

her savings:

> Before . . . we considered a move up here, one of the things we did go over is the cost
> of assisted living.  She was paying between 36 and 3700 dollars a month for rent only,
> and that didn't include . . . her [medical] expenses . . . .  So at that point we figured
> based upon the money that she had in the bank, . . . if she stayed there continuously,
> she'd probably make it to 75 years old, and then she'd be completely out of cash.

(ECF No. 57 at 87:4-14 (Karen's testimony).)[15]  Mother understood the situation.  (*See id.* at 87:15-17

(Karen's testimony).)[16]  "Early [in] 2005, Karen asked . . . [Mother] to think about what would happen

if . . . [Mother] had another stroke and could not communicate so . . .[Mother] executed a [durable

general] power of attorney [the "Power of Attorney"] to Karen . . . and [Sister] . . . on the 16th day of

March 2005."  (Debtor Exh. 1 at tab 24 ¶ 7.)[17]

---

[13]    The $100,000 figure was chosen because that was the deposit insurance limit.  (*See* 11/21/08 S.C. Tr. at 18:12-16 (Karen's testimony).)  The court is not persuaded that there was any connection between the opening of the Charter Money Market Account and the decision to build the Apartment.

[14]    It is assumed herein that deposits into the Citizens Account came from the Charter Money Market Account.

[15]    Sister also testified that being at Sunrise caused Mother to cash flow negatively by about $2,500.00 per month.  (*See* 11/20/08 S.C. Tr. at 11:21–12:14 (Sister's testimony).)

[16]    Moreover, Karen was not satisfied with the quality of Mother's care at Sunrise.  (*See* ECF No. 57 at 55:16–56:22 (Karen's testimony).)

[17]    In fact, the Power of Attorney named only Karen as attorney-in-fact.  (*See* Plaint. Exh. A.)

In 1985 (before he started dating Karen in 1999), Michael purchased the building lot (the "Lot") on which ultimately the House was built.  (*See* ECF No. 57 at 12:17 (Michael's testimony).)  "The purpose of the [L]ot always was to build a house on it."  (*Id.* at 13:3-4 (Michael's testimony).)  In 2004, Michael owned a house in Wolcott, Connecticut.  (*See id.* at:13:13-14 (Michael's testimony).)  At around the time Michael put that house up for sale (*i.e.,* March of 2004), he began looking for builders for the House.  (*See id.* at 13:12-16 (Michael's testimony).)  Michael selected Brookstone Development ("Brookstone") to build the House on the Lot.  (*See* ECF No. 57 at 13:16-25 (Michael's testimony).)  He selected Brookstone "Model Number 816 . . . . [Brookstone] has kind of a base price of around 300 to 350,000 dollars for that home [without a finished basement]," (*id.* at 14:19-22 (Michael's testimony)).  With his other funds, after the sale of his Wolcott home Michael had about $150,000.00 to put into the House if he wanted to do so.  (*See* 11/19/08 S.C. Tr. at 10:17-19 (Michael's testimony).)  Michael and Brookstone took some preliminary steps towards bringing the House to fruition on the Lot such as digging some test wells on the Lot, and figuring out where the House was going to be situated on the Lot.  (*See* ECF No. 57 at 15:1-5 (Michael's testimony).)  Michael and Brookstone "went through the entire process, and then . . . [Brookstone] began drafting a contract [without the Apartment]," (*id.* at 15:6-7 (Michael's testimony)).  However, the process came to a temporary halt when the idea of the Apartment first was suggested.  (*See id.* 15:8-23 (Michael's testimony).)

Karen and Michael were married on April 23, 2005.  (*See* ECF No. 57 at 37:25–38:1 (Michael's testimony).)  It is unclear when Karen and Michael became engaged to be married, but they were engaged to each other at least from the relevant events of 2004.  (*See, e.g., id.* at 19:2-16 (Michael's testimony).)  Karen had no legal interest in either the Lot or the House until Michael quitclaimed such an interest (with right of survivorship) to her on May 3, 2005 (shortly after they were married).  (*See* Plaint. Exh. V.)

- 10 -

It is disputed as to who first suggested the idea of the Apartment: Karen or Mother. Karen testified as follows: "My mother had known that we were engaged and we were looking to build a house, so she had come to me and asked me if I would consider the deal that she had originally had with . . . [Brother]." (ECF No. 57 at 40:11-18 (Karen's testimony).) Karen further testified that she obtained Michael's approval after she discussed the matter with Mother. (*See* ECF No. 57 at 41:2-5 (Karen's testimony); *see also id.* at 15:19–16:23, 18:3-20 (Michael's testimony).) Mother testified to the contrary:

> [I]t was on one visit when they were in the process of building the house, and [Karen and/or Michael said] . . . it's costing too much money for you to live here, which . . . is in assisted living . . . . [And Karen and/or Michael said] would you consider . . . finishing an apartment down in our house downstairs, lower level, while it's in the process of being built, it's better to do it now than to have the house built and then think about doing it.

(11/19/08 S.C. Tr. at 87:13-23 (Mother's testimony).) On balance, the court finds it more probable than not that Karen's recollection on this point is more accurate than Mother's.[18]

Both parties agree that Mother agreed to the idea of the Apartment, the concept being that Mother "would pay for what . . . [she] needed in the . . . [A]partment, and . . . [Mother] would live there the rest of . . . [her] life . . . . That would be whatever they needed to fix up the . . . [A]partment in the lower level," (ECF No. 57 at 66:4-10 (Mother's testimony)). "The discussions were that . . . [Mother] would pay the offset costs for the [A]partment, and . . . [the Debtors] would act as the general contractor." (11/20/08 S.C. Tr. at 76:11-13 (Michael's testimony).) Moreover, Mother would fund her own living expenses while living in the Apartment. (*See* 11/19/08 S.C. Tr. at 96:11-12 (Mother's testimony).) The understanding of the parties in respect of the Apartment never was reduced to writing.

---

[18]    In general, the court found the Debtors to be credible witnesses. The court found Mother to be less credible, but only because of her memory issues.

The parties disagree as to whether the Debtors gave Mother any idea what finishing the Apartment would cost. Mother says that they did not. (*See, e.g.*, ECF No. 57 at 64:21-23) (Mother's testimony).) Michael testified: "I discussed it pretty thoroughly with the builder . . . . We had a figure that we were willing to put on a contract, and I brought that figure down [to Sunrise], and we discussed it with . . . [Mother] . . . . The total house would have been $480,000 [including $150,000.00 for Apartment construction costs] . . . ." (*Id.* at 20:25–21:8 (Michael's testimony).)[19] The court finds Michael's testimony to be more persuasive than Mother's on this point. Moreover, Mother previously had estimated the cost of the smaller proposed apartment with Brother to be approximately $100,000.00. (*See* 11/19/08 S.C. Tr. at 110:15–111:1 (Mother's testimony).) Accordingly, the court finds that Mother reasonably should have expected that finishing the Apartment would cost her in the neighborhood of $150,000.00.[20]

The parties also disagree as to whether the Debtors were to pay Mother back for the Apartment construction costs which she had funded. In an affidavit filed in the State Court Action, Mother averred that "Karen told me . . . 'we are going to take some of your money [for the Apartment] and we will put it back,'" (Debtor Exh. 1 at tab 24 ¶ 5). That alleged statement by Karen also appears in paragraph 3 of the Amended Complaint. (*See* ECF No. 16 ¶ 3.) However, that allegation was denied by the Debtors in the Answer. (*See* ECF No. 29 ¶ 3.) Mother testified at the S.C. Trial about her tentative arrangement with Brother for an apartment in his house which arrangement allegedly contained a "pay-back" concept:

---

[19]     There were approximately $150,000.00 in House and Apartment construction costs that were in addition to the $480,000.00 (and outside the Brookstone Contract (as hereafter defined)) which were covered by Michael from his own funds. (*See infra.*)

[20]     It is unclear whether that estimate was intended to cover furnishings.

[Brother] and his wife, their idea was that they would borrow from me X amount of dollars to put this apartment on, and then they will pay me rent until . . . this bill is paid off . . . .  And should . . . I have died . . . , they would automatically pay off whatever is left, and that would go to my estate, and of course, would go back to the three . . . [siblings] . . . .[21]  So, in essence, it wasn't going to cost me anything. . . .  [T]he apartment would be theirs to begin with, it would never be mine.

(11/19/08 S.C. Tr. at 110:5-14, 111:18-19 (Mother's testimony).)  At the Trial, Karen denied that there was a pay-back feature to the agreement with Mother in respect of the Apartment.  (*See* ECF No. 57 at 41:25–42:5) (Karen's testimony).)  The court finds Karen's testimony to be more persuasive on that point than Mother's testimony, and finds that there was no pay-back feature to the arrangement among Mother, Karen and Michael in respect of the Apartment.

Karen "called . . . [Mother] right before the contract [for the House with the Apartment] was signed because . . . [Karen] wanted to just make sure that we were all on the same page and that . . . [Mother] still wanted this.  And she said yes, she was interested, and . . . [Michael] went forward and signed the contract," (ECF No. 57 at 42:9-14 (Karen's testimony)).  Michael signed the contract (the "Brookstone Contract") with Brookstone for the House with the Apartment[22] on or about November 20, 2004.  (*See* Debtor Exh. 1 at tab 1.)

---

[21]     However, in April of 2005 Mother executed a Last Will and Testament which devised and bequeathed substantially all of her property to Karen (to the exclusion of Sister and Brother).  (*See* Plaint. Exh. FF.)

[22]     Unless specifically stated to the contrary, references hereafter to the House shall be deemed to be references to the House with the Apartment.

The Brookstone Contract provided for the following purchase price and payment schedule:

| | | |
|---|---|---|
| A. | Deposit Upon Owner Signing Contract: | $ 48,000.00 |
| B. | Funds Disbursement Schedule: | |
| | 1.   Completion of Foundation (15%) | $ 72,000.00 |
| | 2.   All framing complete (20%) | $ 96,000.00 |
| | 3.   Rough mechanicals & insulation (25%) | $120,000.00 |
| | 4.   Drywall Exterior & trim (25%) | $120,000.00 |
| | 5.   Final (15%) due upon issuance of C/O and substantial completion | $ 24,000.00 |

TOTAL CONTRACT PRICE:                                                      $480,000.00

(*Id.* at 2.)  The parties discussed and Mother knew that Karen was going to withdraw money from the joint accounts to pay for the expense of finishing the Apartment.  (*See* 11/19/08 S.C. Tr. at 89:23-26 (Mother's testimony); *see also* ECF No. 57 at 52:18-25 (Karen's testimony).)  Mother testified that such withdrawals were "a given,"  (ECF No. 57 at 73:18-23 (Mother's testimony)).  Mother knew that her contribution to the Apartment construction costs would be the first monies committed to constructing the House:

> [Mother and I] discussed in advance that she was going to pay for her apartment as the construction in the beginning of it because . . . [Michael and I] were on the hook for $150,000 for this apartment.  So at that time she knew that I'd be writing these checks, and we . . . discussed it at that point . . . .

(ECF No. 57 at 52:18-25 (Karen's testimony).)  The court finds Karen's testimony on the foregoing points more persuasive than Mother's contrary testimony on those points.

As of the early fall of 2004, Mother had assets worth approximately $379,000.00.  (*See* 11/20/08 S.C. Tr. at 9:15-26 (Sister's testimony).)  Karen made the initial $48,000.00 deposit due under the Brookstone Contract by transferring funds from the Astoria Bank Savings Account to the Astoria Bank Checking Account; a check dated November 23, 2004 in the amount of $48,000.00 then was drawn by Karen in favor of Brookstone on the Astoria Bank Checking Account.  (*See* Debtor Exh. 1 at tab 24 ¶ 6; Plaint. Exh. B.) On April 12, 2005, $81,000.00 was transferred from the Astoria Bank Savings Account

to the Astoria Bank Checking Account.  (*See* Debtor Exh. 1 at tab 24 ¶ 8.)  Two checks dated April 12, 2005 were drawn by Karen in favor of Brookstone from the Astoria Bank Checking Account in the following amounts: $6,660.00 and $72,000.00.  (*See id.*; *see also* Plaint. Exh. C.)[23]  A further check was written by Karen off the Citizens Account to Brookstone: a check in the amount of $26,056.00 dated March 4, 2006.  (*See* Plaint. Exh. E.)  Thus, the aggregate face amount of checks ("Brookstone Checks") written by Karen to Brookstone off the Astoria Bank Checking Account and the Citizens Account was $152,716.00.  (*See* Plaint. Exhs. B, C and E.)  Another check written by Karen off the Citizens Account was a check ("The Kitchen Company Check") dated December 12, 2005 payable to "The Kitchen Company" in the amount of $20,892.00.  (*See* Plaint. Exh. D.)  The Kitchen Company Check was with respect to the Debtors' kitchen in the House, not Mother's kitchen in the Apartment. (*See* 11/19/08 S.C. Tr. at 26:17-21 (Michael's testimony).)  As to the remaining checks (the "Other Checks") written by Karen off the Citizens Account from March 18, 2006 through February 23, 2007, checks in the aggregate amount of $34,717.00 were written by Karen to payees other than Brookstone or The Kitchen Company.  (*See* Plaint. Exh. HH.)  The Other Checks are discussed more fully in part IV.B.3, *infra*.

On or about July 2, 2004, Michael took out a $100,000.00 mortgage (*i.e.,* the Valley Bank Subordinated Mortgage) on the Lot with Valley Bank.  (*See* Plaint. Exh. Q (Schedule B - Section II to "Stewart Title Guaranty Company Commitment").)  That mortgage was unrelated to the construction of the House.  Rather, that loan "[was part of a business venture that . . . [Michael] was entering into with a partner.  In order to secure a $100,000 business loan, both . . . [the] partner and . . . [Michael]

---

[23]       The $72,000.00 check was in payment of the scheduled second payment under the Brookstone Contract.  The $6,600.00 payment appears to have been with respect to a "Change Order" with respect to the Brookstone Contract dated April 10, 2005 for "[e]xtra fill dirt" and "[m]oving fill . . . [and] grading fill."  (*See* Debtor Exh. 1 at tab 2.)  The $48,000.00 check, the $72,000.00 check and the $6,660.00 check hereafter are referred to as the "Brookstone Astoria Bank Checks."

had to provide $100,000 of collateral to that loan."  (11/19/08 S.C. Tr. at 5:18-21 (Michael's testimony).)

On or about May 3, 2005, Michael and Karen took out a $300,000.00 construction mortgage (the "Valley Bank Construction Mortgage") loan with Valley Bank.  (*See id.* at 21:8-11 (Michael's testimony).)  The Valley Bank Construction Mortgage had an adjustable interest rate, not a fixed rate.  (*See* ECF No. 57 at 24:4-7 (Michael's testimony).)  Michael and Karen intended to replace the Valley Bank Construction Mortgage with a fixed-rate mortgage at some point in the future.  (*See id.* at 24:10-13 (Michael's testimony).)[24]  Credit under the Valley Bank Construction Mortgage was extended in its full amount of $300,000.00.  (*See id.* at 24:16-22 (Michael's testimony).)

Michael testified at the Trial that total construction costs for the House aggregated approximately $630,000.00.  (*See* ECF No. 57 at 28:9-15 (Michael's testimony)); *see also* Debtor Exh. 1 at tab 27 ($630,560.25 total).)[25]  Michael did some of the work himself and bought relevant supplies at "Home Depot and Lowe's," (ECF No. 57 at 28:11-13 (Michael's testimony)).  Michael testified at the Trial that Mother contributed "about $173,000" to the project for the Apartment.  (*See id.* at 28:19-22 (Michael's testimony).)  The balance of the $630,000.00 construction costs beyond the proceeds of the Valley Bank Construction Mortgage and Mother's $173,000.00 contribution came from Michael's funds.  (*See* ECF No. 57 at 29:12-17 (Michael's testimony).)  That consumed all or a significant portion of Michael's $150,000.00.  (*See* 11/19/08 S.C. Tr. at 40:23-25 (Michael's testimony).)  The court credits Michael's testimony on all of the foregoing.

---

[24]    The Valley Bank Subordinated Mortgage was subordinated to the Valley Bank Construction Mortgage pursuant to a subordination agreement dated May 2, 2005.  (*See* Plaint. Exh. Q (Schedule B - Section II to "Stewart Title Guaranty Company Commitment").)

[25]    It is not remarkable that the cost of the House was more than its 2007 appraised value. That is because (as explained by the appraisal testimony at the S.C. Trial (*see infra*)) almost none of the Apartment costs were included in that appraised value.

Karen and Michael gave Mother pictures of the outside of the House while it was under construction. (*See* 11/19/08 S.C. Tr. at 126:26–127:3 (Mother's testimony).)  However, Mother never actually saw the House until she moved into the Apartment.  (*See id.* at 88:21–89:1 (Mother's testimony).)  Mother testified as to the reason for that:  "But I couldn't go up there to see it, because it was winter, and it was snow, and when it wasn't snow it was all mush on the ground because it hadn't been completed yet, and there was no way for me to get into the house in this condition."  (*Id.* at 88:21-25 (Mother's testimony).)

The Apartment was to be a full apartment with a full bath, a kitchen and a living area.  (*See* 11/19/08 S.C. Tr. at 124:12-18 (Mother's testimony).)  The finished Apartment contained 945 square feet, also had a gas-fired fireplace, a bedroom and "everything to accommodate an individual's living and [was] very nicely done," (11/20/08 S.C. Tr. at 28:14-15, 30:22-26 (testimony of Andrew Carbutti (the Debtors' appraiser witness)); *see also* 11/19/08 S.C. Tr. at 128:9-14 (Mother's testimony)). Michael and Karen devoted a great deal of thought and care to making the Apartment suitable for Mother.  The plans for the original House were changed substantially to specially accommodate the construction of the Apartment, including:  using lever operated lock units on the door knobs so they were easier for Mother to operate; picking out special nonslip linoleum flooring for the kitchen; using a low pile Berber carpet for the remainder of the Apartment because Mother used a walker; outfitting the walls with 2 by 8 framing boards, horizontally, at 36 and 52 inches to accommodate grab bars; using foam insulation on the walls with the grab bar equipment; installing a French double door which opened to the back of the house in case Mother needed to get out quickly or be taken out of the house quickly; designing an angled wall through the walkway so that if Mother later became bedridden, a hospital bed on wheels could rotate to move her from her bedroom to the main portion of the Apartment; designing the bathroom wide enough to accommodate a wheelchair; installing a low step shower with a seat so

- 17 -

it was easier for Mother to get in and out; designing an additional drain in the bathroom which would allow for relocation of the shower in case Mother needed additional help while using the bathroom at a later stage in her life; installing pullout drawers on all of the cabinets rather than shelves; designing the kitchen so that a wheelchair could go right up to the sink; and generally making the Apartment handicapped equipped and accessible.  (*See* 11/20/08 S.C. Tr. at 77:18–79:12 (Michael's testimony).)

The Apartment added to the cost of the original House in other ways.  For example, in light of the addition of the Apartment, the Planning and Zoning Commission required Michael to build a septic system that was suitable for a five-bedroom home (instead of the smaller three-bedroom size system for the original House as planned).  That larger system also required a system redesign by ASW Consulting and additional percolation tests.  Michael was financially responsible for all of those additional costs.  (*See* 11/20/08 S.C. Tr. at 81:21–82:27 (Michael's testimony).)  Moreover, certain changes had to be made to the original House plumbing to accommodate the Apartment.  (*See id.* at 109:16–110:7 (Michael's testimony); *see also id.* at 103:12–104:25, 106:8-11 (Michael's testimony as to certain other changes).)  In all, the Apartment added approximately $188,000.00 to the cost of the House.  (*See* Plaint. Exh. N ($188,040.00 total added cost).)

Approximately an additional $32,000.00 went for furnishing the Apartment:

> [The money was] for furnishing the apartment because . . . when . . . [Mother] had sold her house she sold everything.  And when she lived . . .[at Sunrise] all she had was a twin bed [which she gave away], a rocker chair [which she gave away] and a dresser. . . .  So . . . [Karen and Michael] completely furnished.  [They] . . . bought furniture, appliances, the countertops, the bathroom needs . . . fixtures put into there, carpeting, her bed [collectively, the "Furnishing Costs"].

(ECF No. 57 at 46:11-23 (Karen's testimony).)  The Furnishing Costs were put on Karen's debit and credit cards and Karen later reimbursed herself out of the Citizens Account for the Furnishing Costs.  (*See id.* at 47:4-14 (Karen's testimony).)  Karen's ability to account for that $32,000.00 was made "very

difficult" because she had not expected Mother to leave with the box of receipts as she did (see below).

(*See* ECF No. 57 at 49:19–50:21 (Karen's testimony).)

Some retrofitting (the "Chair Lifts") was required for the stairs after Mother moved in. Michael did most of that himself:

> I installed two chair lifts in the stairwell. Initially, . . . Mother . . . said that she was okay walking stairs . . . . I had a set of stairs put in with a landing, instead of one long staircase, we put it in with a landing. When we got her moved in, we found that she was not capable of walking the stairs, and we actually wound up having to put in two chair lifts . . . to accommodate the configuration of the stairs . . . . I purchased them . . . [and] had them delivered . . . . I purchased the aluminum extrusions that they ride on. They then have to be custom fit . . . . I had to have them custom machined . . . and . . . I put them on the stairs, wired them in, and basically installed them.

(11/20/08 S.C. Tr. at 79:19–80:10 (Michael's testimony).)

While Mother lived with the Debtors, the Debtors paid for certain of Mother's living expenses (including prescriptions). (*See, e.g.,* Debtor Exh. 1 at tab 17, 17a (receipts).) Mother was aware that the Debtors were utilizing their personal funds for that purpose and Mother said to be "sure . . . [to pay yourselves] back." (11/20/08 S.C. Tr. at 144:26–145:1 (Michael's testimony).)

It is undisputed that Karen and Michael never offered Mother an interest of record in the House or encouraged Mother to talk to a lawyer, and that Mother never asked for either. Mother moved into the Apartment in October of 2006. (*See* Debtor Exh. 1 at tab 24 ¶ 15.) At the Trial, Mother complained that the Apartment was in the "cellar" (she may not have understood that the Apartment was at a below-grade level). (*See, e.g.,* ECF No. 57 at 64:15-18 (Mother's testimony).) However, at the Trial Mother conceded that the Apartment was "beautiful," (*id.* at 79:25–80:2 (Mother's testimony); *see also* 11/19/08 S.C. Tr. at 97:1-5 (Mother's testimony)). In fact, when Mother first moved into the Apartment, she was "thrilled" with it and called all her friends to tell them how much she liked it. (*See id.* at 134:15-21 (Mother's testimony).)

Mother concedes that she "wasn't . . . treated badly" by the Debtors when she lived with them. (*See* 11/19/08 S.C. Tr. at 137:23 (Mother's testimony).) However, Mother expected substantially more interaction with the DePinna family than she believed she got, and was unhappy when she did not get it. (*See* Debtor Exh. 1 at tab 24 ¶ 15.) For example, Mother knew that Michael and Karen were employed full time (although Karen had Fridays as a work-at-home day). (*See* 11/19/08 S.C. Tr. at 125:11-19 (Mother's testimony).) "[Mother and Karen] used to like to hang out, go to lunch or something like that, and . . . [Mother] assumed that . . . on Fridays . . . [she and Karen] would do that or go to the store or something like that." (*Id.* at 148:15-18 (Mother's testimony).) That did not happen (*see id.* at 148:19-24 (Mother's testimony)), and "that hurt [Mother]," (*id.* at 148:24 (Mother's testimony)).[26] On the other hand, Karen did not appreciate fully what she was taking on when she had Mother come live with Michael and her. For example, Karen had trouble dealing with Mother's medical appointments. (*See id.* at 100:23-26 (Mother's testimony).) Mother came to feel that Karen believed that she "had made a mistake" in having Mother come live with the Debtors. (*See id.* at 101:13-14 (Mother's testimony).)

Mother became increasingly uncomfortable living in the House and made the decision to return to Sunrise. (*See* 11/19/08 S.C. Tr. at 101:8-10, 102:20-24 (Mother's testimony).) Mother began to ask for an accounting of her money. (*See id.* at 152:17-22 (Mother's testimony).) In response, Karen brought Mother a carton of receipts and other records in respect of Mother's finances. (*See id.* at 153:3-8 (Mother's testimony).) Mother did not look through the carton but unexpectedly took it with her when she left Connecticut, after which she "packed [it] away somewhere." (*Id.* at 153:9-19 (Mother's

---

[26]     Mother went by bus to "senior care" three days a week. (*See id.* at 136:2-24 (Mother's testimony).) Mother also had a home health aide visit for four hours twice a week. (*See id.* at 134:26 – 135:23 (Mother's testimony).) Karen arranged for both of the foregoing but Mother paid for them. (*See, e.g., id.* at 135:2-5 (Mother's testimony).)

testimony).)  The Debtors did not have access to the carton and/or its contents when they tried to do a

subsequent accounting.  (*See* ECF No. 57 at 49:25–50:21 (Karen's testimony).)  Mother inquired of

Michael as to financial "exit strategies," and was dismayed to discover that there were none.  (*See e.g.*,

11/19/08 S.C. Tr. at 40:14-20 (Michael's testimony);[27] 11/20/08 S.C. Tr. at 121:21-25 (Michael's

testimony).)[28]  Nevertheless, in or about March of 2007 Mother moved back to Sunrise.  (*See* 11/19/08

S.C. Tr. at 96:2-4 (Mother's testimony).)  It appears that the parties have not spoken to each other since

Mother moved out of the Apartment.  (*See* 11/21/08 S.C. Tr. at 55:8-19 (Karen's testimony) (The day

Mother left was "the last time any of us ever spoke.").)  The Debtors did not put the Apartment to any

meaningful use after Mother left, nor did they try to rent it.  (*See* 11/20/08 S.C. Tr. at 123:9-23

(Michael's testimony); 11/21/08 S.C. Tr. at 55:20–56:6 (Karen's testimony).)

In July of 2007, the Debtors applied to Countrywide to refinance the Valley Bank Construction

Mortgage.  (*See* ECF No. 57 at 24:19-22) (Michael's testimony).)  The Countrywide First Mortgage had

a fixed rate of interest of 6.375% per annum and was in the original amount of $310,500.00.  (*See*

Plaint. Exh. P (Note).)  Of that $310,500.00, $295,000.00 was to pay off the Valley Bank Construction

Mortgage, and approximately $15,000.00 was for "points."  (*See* ECF No. 57 at 24:22–25:1 (Michael's

testimony).)  At substantially the same time, the Debtors also applied for the Countrywide Second

Mortgage in the original amount of $99,000.00 (*see* Plaint. Exh. Q (Subordination Agreement); Plaint.

Exh. O) for the following reasons:

> [Michael] had been attempting to open a business while . . . [Michael] was building the
> [H]ouse.  It fell into a number of problems and delays.  [Michael] . . . had some business

---

[27]   "I told . . . [Mother] that there was no way to recover the monies that [had] . . . already
been paid for the [Apartment] construction."  (*Id.* at 40:19-20 (Michael's testimony).)

[28]   "I told . . . [Mother] that I thought her choice to move back to Sunrise, considering the
fact that she couldn't afford to live there very long and she would quickly run out of money, was
basically -- she was committing financial suicide by making such a move." (*Id.*)

debt in the form of credit card debt, about $45,000 worth. [The Debtors] . . . also had some back taxes that were owed because, while [they] . . . were building . . . [the House], the Town was sending the tax bills to [Michael's] . . . home in Wolcott, which [he] . . . didn't live there anymore. So [the Debtors] . . . didn't get any of these bills. [The Debtors] . . . amassed about $12,000 in back tax debt as well. So [Michael] . . . wanted to get those cleared up as well.

[Michael] . . . spoke to Countrywide . . . . They recommended that, to take out a home equity loan. The [H]ouse had appraised for $560,000 [sic]. So [the Debtors] . . . weren't encumbering the entire thing. And [Countrywide] . . . recommended [Michael] . . . take out an additional hundred thousand dollars in a home-equity loan.

(ECF No. 57 at 25:2-20 (Michael's testimony).) Various of the debts referred to above were paid off at closing. (*See* Plaint. Exh. Q (proposed HUD 1 Settlement Statement Attachment); Plaint. Exh. P (Settlement Statement).) However, the Valley Bank Subordinated Mortgage was not paid off at the closing but, rather, was subordinated to the two Countrywide Mortgages pursuant to a Subordination Agreement dated August 27, 2007. (*See* Plaint. Exh. Q.)

On or about September 17, 2007, the Plaintiffs commenced the State Court Action against the Debtors. (*Cf.* ECF No. 16 ¶ 8.)[29] The Plaintiffs sought a prejudgment remedy of attachment (the "PJR Application") against the House. (*See* Debtor Exh. 1 at tab 24.) The Debtors applied for the Countrywide Mortgages before the original complaint in the State Court Action and the PJR Application had been served upon them. (*See* ECF No. 57 at 26:15-20 (Michael's testimony).) There were "a number of delays" in closing the Countrywide mortgage loan transactions and those transactions did not close until early October, 2007 (*i.e.,* after the PJR Application was served but before such relief was granted). (*See id.* at 26:23–27:5 (Michael's testimony).)

The S.C. Trial was a bench trial held over three days. (*See* Debtor Exh. 2.) At the S.C. Trial, Mother, the Debtors, Sister and Mr. Andrew Carbutti testified (among other witnesses). (*See id.*) Mr.

---

[29]     The original complaint in the State Court Action was amended on or about November 21, 2007. (*See* Debtor Exh. 3, the "Amended State Court Complaint.") The Amended State Court Complaint is discussed more fully at part III.B.2, *infra.*

Carbutti testified for the Debtors.  (*See* 11/20/08 S.C. Tr. at 23 *et seq.*)  Mr. Carbutti at that time was

a certified general real estate appraiser.  (*See id.* at 23:15 (Mr. Carbutti's testimony).)  He had appraised

the House for Countrywide in July of 2007.  (*See id.* at 24:9-14 (Mr. Carbutti's testimony).)[30]  He

appraised the House at $546,000.00 at that time.  (*See id.* at 31:9-11 (Mr. Carbutti's testimony).)

Because of then-current market conditions, Mr. Carbutti appraised the House at $516,000.00 for the

Debtors as of the time of the S.C. Trial.  (*See id.* at 27:14-15 (Mr. Carbutti's testimony).)  Mr. Carbutti

valued the Apartment as a "finished basement" to the House. (*See id.* at  28:9–30:10 (Mr. Carbutti's

testimony).)  He did not value the Apartment as a potential rental unit because he believed that such use

would be contrary to applicable Oxford zoning regulations.  (*See id.* at 37:22–38:3 (Mr. Carbutti's

testimony).)  As a finished basement, Mr. Carbutti opined that the Apartment added only $4,725.00 in

value to the House.  (*See id.* at 30:12-18 (Mr. Carbutti's testimony).)  The court credits Mr. Carbutti's

opinions.[31]

Sister also testified for the Plaintiffs at the S.C. Trial.  Among other testimony she testified that,

as of the time of the S.C. Trial, Mother had virtually no money left other than a $663.42/month pension

and Social Security benefits in the amount of $957.10/month.  (*See* 11/20/08 S.C. Tr. at 11:2-8, 21-23

---

[30]    It is a fair assumption that Countrywide made the Countrywide Mortgage loans based on that appraisal as a "borrowing base."

[31]    There was no appraisal testimony for the Plaintiffs at the S.C. Trial (*see* Debtor Exh. 2) or at the Trial (*see* ECF No. 57).  Even if the court incorrectly credits Mr. Carbutti's opinion that the Apartment construction costs did not add to the value of the House to any substantial degree, the result reached hereinbelow would be the same.  That is because the issue here is not whether the Apartment construction costs added to the value of the House but, rather, whether the Debtors wrongfully obtained or appropriated that value (which, as explained below, they did not).  Also, as explained below, unjust enrichment, standing alone, does not result in a nondischargeable debt.

(Sister's testimony).)[32]  At the time of the S.C. Trial, Mother still was living at Sunrise (although in

lesser accommodations).  (*See* 11/19/08 S.C. Tr. at 139:20-23 (Mother's testimony).)

On or about February 13, 2009, the Superior Court issued a decision (Debtor Exh. 4, the

"Original Decision") ordering entry of judgment for the Plaintiffs in the amount of $180,000.00.  (*See*

*id.*)[33]  On or about March 16, 2009, the Superior Court issued the Interest Order which awarded

prejudgment interest in the amount of $16,520.00 on the judgment pursuant to Section 52-192a of the

Connecticut General Statutes.  (*See* ECF No. 46 (attachment).)  Some time prior to June 9, 2009, the

Debtors took an appeal (the "Appeal") from the State Court Judgment.  (*Cf.* ECF No. 61 (attachment).)

On or about June 9, 2009, the Superior Court issued the Stay Decision which granted to the Plaintiffs

partial relief from the state-law stay pending appeal pursuant to Practice Book § 61-11 to the extent that

the Debtors were required to pay Mother $1,500.00 per month.  (*See* ECF NO. 61 (attachment).)  As

noted above, the Debtors commenced this case on July 17, 2009.  As of the Trial, Mother appears to

be living at Emeritis Assisted Living Facility in Torrington, Connecticut.  (*See* ECF No. 16 ¶ 1.)

### III.    RESOLUTION OF CLAIM/ISSUE PRECLUSION DEFENSES

#### A.    Claim Preclusion Re: Fraud (11 U.S.C. § 523(a)(2))

Construing the Debtors' arguments broadly, the Debtors appear to be arguing (among other

things) that, because the Plaintiffs could have brought a fraud claim in the State Court Action and did

not, the State Court Judgment precludes them from bringing a Section 523(a)(2) claim now.  That

---

[32]    Approximately $208,000.00 of Mother's funds is at issue here.  It is not suggested that
the remaining $170,000.00 (approximate) of exhausted funds was attributable in any way to the alleged
misconduct of the Debtors.  Given the record here, it is a fair assumption that the $170,000.00
(approximate) in funds was expended by an authorized payor for Mother's rent and other living
expenses.

[33]    The Original Decision is discussed more fully at part III.B.2.a, *infra*.

argument speaks not to the doctrine of issue preclusion/collateral estoppel but, rather, to the doctrine of claim preclusion/res judicata.

In *ERA Franchise Sys., LLC v. Kroeber (In re Kroeber)*, No. 09-3093, 2010 WL 4064026 (Bankr. D. Conn. Oct. 15, 2010), this court concluded that a creditor is not required to plead every theory of relief possible in the non-bankruptcy forum in order to anticipate a future bankruptcy and a Section 523 action which may never come. *See id.,* at *10. In *Kroeber*, this court followed *Brown v. Felsen,* 442 U.S. 127 (1979), and "refused to apply res judicata [claim preclusion] in determining the dischargeability of debts previously reduced to judgment," *Kroeber*, 2010 WL 4064026, at *10, even if the theoretical basis for the subject Section 523(a) claim (*e.g.,* fraud) could have been pleaded in the non-bankruptcy court but was not. *Id.* (citation omitted). This court concluded in *Kroeber* that "claim preclusion does not bar the litigation here. Rather, the 'battle' should be fought under the rubric of collateral estoppel/issue preclusion." *Id.* (footnote omitted). The court reaches the same conclusion here.

### B.   Issue Preclusion/Collateral Estoppel

#### 1.   In General

Collateral estoppel, or issue preclusion, prevents a party from relitigating an issue that has been determined by a final judgment in a prior suit. *Aetna Casualty & Surety Co. v. Jones*, 220 Conn. 285, 303-04 (1991). The basic premise of collateral estoppel is that "once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 336 n.23 (1979). The party seeking the benefit of the doctrine bears the burden of establishing its applicability. *Dowling v. United States*, 493 U.S. 342, 350 (1990).

Collateral estoppel or issue preclusion principles apply to nondischargeability proceedings in bankruptcy. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991). Under the Full Faith and Credit Act,

28 U.S.C. § 1738, determinations regarding the preclusive effect of state court judgments are made using the law of the state in which the judgment was rendered. *See, e.g.*, *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985); *Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002).

Since the State Court Judgment was rendered by the Connecticut Superior Court, Connecticut state law regarding collateral estoppel and issue preclusion applies in this case. "Issue preclusion arises when an issue is actually litigated and determined by a valid and final judgment, and that determination is essential to the judgment." *LaBow v. Rubin*, 95 Conn. App. 454, 461, *cert. denied,* 280 Conn. 933 (2006) (internal quotation marks omitted).[34] As the Connecticut Supreme Court explained in *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705 (1983):

> An issue is *necessarily determined* if, "in the absence of a determination of the issue, the judgment could not have been validly rendered." If an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta.

*Id.* at 714-15 (citations and internal quotation marks omitted).

---

[34]     As noted above, prepetition the Debtors took the Appeal from the State Court Judgment. The parties have not apprised the court as to whether the Appeal still is pending. However, as noted above, the Debtors scheduled the State Court Judgment debt as undisputed in the case. The parties have not addressed the "final judgment" (*i.e.,* the Appeal) issue in their respective briefs and, accordingly, the court will deem the "finality" point to be conceded by the Plaintiffs. In any event, as becomes apparent in part III.B.2, *infra*, the court's decision with respect to Section 523(a)(4) rests on alternative grounds, and the court finds and/or concludes that the Section 523(a)(2) fraud issue is not precluded by the State Court Judgment. Accordingly, the "finality" issue has no effect on the result here.

### 2.    Application of Law to Fact

The Amended State Court Complaint sounded in three counts: Unjust Enrichment (as to both

Debtors); Equitable Accounting (as to both Debtors, the "Accounting Count");[35] and Breach of

Fiduciary Duty (as to Karen only).  (*See* Debtor Exh. 3.)

### a.    11 U.S.C. § 523(a)(4) Claim (Breach of Fiduciary Duty Count of Amended State Court Complaint)

Section 523(a) of the Bankruptcy Code provides in relevant part:

> A discharge under section 727 . . .  or 1328(b) of this title does not discharge an
> individual debtor from any debt –
>
> . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or
> larceny . . . .

11 U.S.C.A. § 523(a)(4) (West 2011).  In adjudicating the Amended State Court Complaint, the

Superior Court grounded its award solely on the theory of unjust enrichment:

> "Unjust enrichment applies wherever justice requires compensation to be given
> for property or services rendered under a contract, and no remedy is available by an
> action on the contract . . . . A right of recovery under the doctrine of unjust enrichment
> is essentially equitable, its basis being that in a given situation it is contrary to equity and
> good conscience for one to retain a benefit which has come to him at the expense of
> another." (Citation omitted.) *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire
> Co.,* 231 Conn. 276, 282, 649 A.2d 518 (1994).  "The [three basic requirements of the
> doctrine of unjust enrichment] are that (1) the defendant was benefitted, (2) the
> defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of
> payment was to the plaintiff's detriment . . . . All the facts of each case must be
> examined to determine whether the circumstances render it just or unjust, equitable or
> inequitable, conscionable or unconscionable, to apply the doctrine." (Citation omitted.)

---

[35]    To support an action of accounting, *one* of several conditions must exist.
There must be a fiduciary relationship, *or* the existence of a mutual
and/or complicated accounts, *or* a need of discovery, *or* some other
special ground of equitable jurisdiction such as fraud.

*Mankert v. Elmatco Products, Inc.,* 84 Conn. App. 456, 460 (2004) (internal quotation marks omitted).
"Actions for [a]ccounting" are subject to Sections 52-401 *et seq.* of the Connecticut General Statutes.

*Gagne v. Vaccaro,* 255 Conn. 390, 409, 766 A.2d 416 (2001), on appeal after remand, 80 Conn. App. 436, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004).

> Applying the three prong analysis of the doctrine of unjust enrichment to the present case, the court finds that the more credible evidence indicates that the defendants were unjustly enriched. First, the defendants benefitted from the plaintiff's funding of the construction of the in-law apartment because they now have an apartment that certainly constitutes a capital improvement to their residence, even if not rentable. Second, the defendants have unjustly failed to pay the plaintiff for the benefits they have received from her financial contributions toward the construction of this in-law apartment. This failure to reimburse the plaintiff is notwithstanding the fact that this in-law apartment may not have been built in the first place without some tacit consent or understanding between the parties. Said funding from her bank accounts has made the plaintiff financially disadvantaged and unable to meet her daily living expenses.

(Debtor Exh. 4 at 5-6 (alterations in original).)  The Superior Court made no mention of the other two counts.  (*See* Debtor Exh. 4.)

Sometimes, if a court in its decision fails to allude to certain counts of the complaint, such treatment by the court is an indication that the court found it unnecessary to address such counts because they were in some sense duplicative of the count(s) upon the court's decision was based.  However, the court is persuaded that such was not the case here.  That is because, in its decision, the Superior Court used the following measure of damages:  "Since the defendants were unjustly enriched, the defendants must make restitution.  The measure of damages is the benefit to the defendant, *not the loss to the plaintiff. Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* supra, 231 Conn. 285." (Debtor Exh. 4 at 6 (emphasis added).)  That measure of damages is different from the "actual damages" measure of damages for breach of fiduciary duty. *Cf. Wilcox v. Schmidt,* WWMCCV0440011263, 2010 WL 2817490, at *10 (Conn. Super. June 3, 2010) ("The measure of damages for breach of fiduciary duties is the amount required to restore the value of what was lost by the breach, and to prevent the fiduciary from benefitting personally from the breach . . . .  Simply, '[t]he plaintiff may recover his or her actual damages on a claim for breach of fiduciary duty.'" (citations and internal quotation marks

- 28 -

omitted)).[36]  Moreover, in the State Court Action (as in this adversary proceeding) the Plaintiffs based

their claim of fiduciary duty entirely on the existence of the Power of Attorney.  (*See* Debtor Exh. 3 at

5.)  However, in the Original Decision, the Superior Court noted that "[s]aid power of attorney was

never utilized by . . . [Karen],"  (Debtor Exh. 4. at 3).  Further, in the State Court Action the Plaintiffs

sought an award of attorney's fees and other exemplary damages.  (*See* Debtor Exh. 3 at 6.)  In the

Original Decision, the Superior Court awarded neither.  (*See* Debtor Exh. 4 at 6.)  Finally, in the Stay

Decision the Superior Court stated:

> The Court's decision was based on a theory of unjust enrichment in which the defendants benefitted from the plaintiff's investment in their private residence in Oxford and that the plaintiff had suffered a financial detriment . . . .

> The Court recognizes that in some part the plaintiff finds herself in this financial dilemma because of her own discretionary capital improvement to her daughter's home and then deciding to leave the said home for personal reasons . . . .

(ECF No. 61 (attachment at 1, 3).)

Based upon the foregoing, the court is persuaded that the Superior Court actually decided the

breach of fiduciary duty count of the Amended State Court Complaint against the Plaintiffs and, because

the measure of damages was affected, such decision was necessary to the State Court Judgment.

Accordingly, the Debtors' defense of issue preclusion/collateral estoppel must prevail with respect to

the Plaintiffs' Section 523(a)(4) claim of nondischargeability.

---

[36]      Similarly, the thrust of an action for an accounting is not restitution but, rather, to "adjust the accounts [and] find the balance due . . . ," Conn. Gen. Stat. Ann. § 52-402(d) (West 2011).  In any event, the Accounting Count adds nothing to the dischargeability analysis.  That is because, as noted above, an action for accounting can be based upon dischargeable grounds (*i.e.,* "complicated accounts") or nondischargeable grounds (in this case the relevant grounds would be breach of fiduciary duty and/or fraud).  *See Mankert v. Elmatco Products, Inc., supra.*  As discussed above, the Superior Court found against the Plaintiffs on the breach of fiduciary duty issue; as discussed both above and below, the State Court Judgment does not preclude any fraud claim/issue that the Plaintiffs might assert.

However, even if the court is mistaken and a Section 523(a)(4) claim is not barred by issue preclusion, the result is the same. That is because, in this adversary proceeding, the Plaintiffs base their claim of fiduciary status solely on the existence of the Power of Attorney. As discussed in part II, *supra,* the Power of Attorney was executed and delivered in contemplation of an event which never occurred (*i.e.,* Mother's being unable to communicate). The court has not been directed to any evidence that the Power of Attorney ever was used by Karen either in breach of her fiduciary duty or otherwise. Based upon the foregoing and as a separate and independent basis for its decision for Karen on the Section 523(a)(4) claim, the court is not persuaded that there was a "fraud or defalcation [by Karen] while acting in a fiduciary capacity" within the purview of Section 523(a)(4).

### b.   11 U.S.C. § 523(a)(2)(A)

Section 523(a) of the Bankruptcy Code further provides in relevant part:

A discharge under section 727 . . .  or 1328(b) of this title does not discharge an individual debtor from any debt –

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C.A. § 523(a)(2) (West 2011).

As noted above, the Amended State Court Complaint did not have a fraud count. The Debtors argue that such a count was impliedly submitted to the Superior Court. However, the court is not persuaded that the Superior Court perceived that a fraud count had been submitted to it. (*Cf.* Debtor

Exh. 4.)[37]   Accordingly, the Debtor's issue preclusion/collateral estoppel defense must fail as to the

Plaintiffs' Section 523(a)(2)(A) claim of nondischargeability.

## IV.   NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2)(A)

### A.   Applicable Law

As noted above, Bankruptcy Code § 523(a)(2)(A) allows the court to make a determination of

nondischargeability for "any debt – for money, property, services, or an extension, renewal, or

refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud

. . . ." 11 U.S.C.A. § 523(a)(2)(A).   "Section 523(a)(2)(A) lists three separate grounds for

dischargeability: actual fraud, false pretenses, and a false representation." *Deady v. Hanson (In re*

*Hanson),* 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010).  Exceptions to discharge must be strictly construed

in favor of the debtor in order to effectuate the fresh start policy of bankruptcy. *Rosenblit v. Kron (In*

*re Kron)*, 240 B.R. 164, 165 (Bankr. D. Conn. 1999) (Krechevsky, J.).   Furthermore, the "debtor's

conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment

or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient."

*Id*. at 165-66 (citation and internal quotation marks omitted).   The party seeking to establish an

exception to the discharge of a debt bears the burden of proof by a preponderance of the evidence.

*Grogan,* 498 U.S. 279; *Ramos v. Rivera (In re Rivera),* 217 B.R. 379, 384 (Bankr. D. Conn. 1998)

(Dabrowski, J.).

---

[37]      It should be noted that a finding of unjust enrichment is not the same thing as a finding
of fraud.  That is because fraud has an element of intent and unjust enrichment does not.  *See, e.g.,*
*Hoffman v. Anstead (In re Anstead),* 436 B.R.497, 502 (Bankr. N.D. Ohio 2010) ("[A] claim for 'unjust
enrichment' is not at all defined by reference to a person's intentions, but is rather defined in terms of
the effect a person's actions had on another."). *Cf. Connecticut Nat'l Bank v. Chapman,* 153 Conn.
393 (1966) (proof of tortious or fraudulent act unnecessary); *Franks v. Lockwood,* 146 Conn. 273
(1959) (same).

The Supreme Court has held that § 523(a)(2)(A)'s reference to "actual fraud" was intended to "incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." *Field v. Mans*, 516 U.S. 59, 71, n. 9, 116 S. Ct. 437, 133 L.Ed.2d 351 (1995). The Second Circuit has construed the meaning of actual fraud to include "a false representation, scienter, reliance, and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006) (citing Restatement (Second) of Torts § 525). Thus, courts in this circuit have found that "actual fraud" by definition consists of "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another-something said, done or omitted with the design or perpetrating what is known to be a cheat or deception." *See e.g., In re Lyon*, 348 B.R. 9, 22 (Bankr. D. Conn. 2006).

*McCarron v. Andrews (In re Andrews),* 385 B.R. 496, 508 (Bankr. D. Conn. 2008) (Shiff, J.).

[B]ecause common law fraud does not always take the form of a misrepresentation, a creditor need not allege misrepresentation and reliance thereon to state a cause of action for actual fraud under § 523(a)(2)(A). Rather, the creditor must establish the following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute. The fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones. The existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor.

*Hanson,* 432 B.R. at 772 (citations omitted).

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama),* 192 B.R. 922, 927 (Bankr.N.D.Ill.1996). [F]alse pretenses [is defined] as follows:

[A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor . . . .

A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Hanson,* 432 B.R. at 771 (first and second alteration added).

To establish nondischargeability on the basis of "false representation" it must be proved that: (1) the debtor made representations; (2) knowing them to be false; (3) with the intent and purpose of deceiving the creditor; (4) upon which representations the creditor actually and justifiably relied; and (5) which proximately caused the alleged loss or damage sustained by the creditor. *American Express Centurion Bank v. Truong (In re Truong)*, 271 B.R. 738, 744 (Bankr. D. Conn. 2002).

**B.**   **Application of Law to Fact**

The Plaintiffs argue nondischargeability under Section 523(a)(2)(A) asserting various arguments, alone and in the aggregate. The court specifically will address the Plaintiffs' more substantial arguments immediately below.

**1.**   **The Apartment Was a Pretext To Get the House Built**

For the reasons discussed below, the court is not persuaded that the Apartment was anything but part of a good-faith plan by the Debtors to provide for Mother's long-term care.

To support their argument that the Apartment was merely a pretext to get the House built, the Plaintiffs point to the fact that actual construction of the House did not start until after Mother had agreed to the concept of the Apartment. The court is not persuaded that the Debtors had given Mother the impression that actual construction of the House had previously begun. Moreover, the court is persuaded by Michael's testimony that some preliminary steps had been made towards construction of the House (without the Apartment) prior to the fateful meeting between Mother and the Debtors. In any event, it is Mother who first suggested the concept of the Apartment, not the Debtors. The court is not persuaded that there was any connection between the opening of the Charter Money Market Account and the initiation of the plan to build the Apartment. Further, the finished Apartment evidences that the Debtors put a great deal of thought and care into making the Apartment suitable for Mother. That is

not consistent with the Plaintiffs' "pretext" argument.  Moreover, the court credits Michael's testimony

that a substantial amount of his personal funds went into the House project.

The Plaintiffs also make a great deal of the fact that the Brookstone Astoria Bank Checks were

the first monies into the project.  The court credits Karen's explanation for that and accepts it as a

reasonable arrangement under the circumstances.  Moreover, as noted above, Karen explained the

funding arrangement to Mother before they went forward with the project.  (*See* ECF No. 57 at 52:18-25

(Karen's testimony).)  Even assuming (but not finding) that the other Brookstone Checks and The

Kitchen Company Check were issued prior to any other funds (*i.e.,* mortgage proceeds and/or Michael's

funds) going into the project, the result is no different.  The aggregate face amount of those five checks

(*i.e.,* the Brookstone Checks and The Kitchen Company Check) was approximately $173,000.00 and,

as noted in part II, *supra,* the court has found that construction costs for the Apartment were

approximately $188,000.00.  If the House (including the Apartment) had not been completed, the timing

of Mother's payments might have been an issue.  However, it is uncontested that the House (including

the Apartment) *was* completed.  Accordingly, the timing of Mother's payments is a moot point.

## 2. **Failure To Protect Mother's Interests**

The Plaintiffs complain that the Debtors did not consult a lawyer on Mother's behalf, that there

was no written agreement among Mother and the Debtors in respect of the Apartment, that Mother had

no interest of record with respect to the House, and the like.  Prudence should have dictated that the

Debtors consult an appropriate legal specialist prior to embarking on the Apartment project, both for

Mother's protection and their own.  In many respects, this was a poorly thought out plan: Mother and

Karen had not perceived what the realities of Mother's leaving Sunrise and living in the Apartment

would be; and there was no "exit strategy" for Mother if things did not work out.[38]  However, the foregoing represents poor judgment on the Debtors' part, not "moral turpitude."

### 3.    Failure to Account

As noted above, the court has found that the Apartment construction costs were approximately $188,000.00.  The aggregate amount of the Brookstone Checks and The Kitchen Company Check was approximately $173,000.00.  The court finds that Mother sufficiently authorized Karen's drawing of those five checks.  Comparing the cost of the Apartment (approximately $188,000.00) to the amount of those checks (approximately $173,000.00) is (under these circumstances) a sufficient accounting for those items.

The Other Checks were drawn as follows:

| Check # | Date | Payee | Amount |
|---------|------|-------|--------|
| 503 | 3/18/2006 | Karen DePinna | 4,000.00 |
| 541 | 4/1/2006 | Karen DePinna | 4,000.00 |
| 543 | 6/12/2006 | Michael Conway[39] | 250.00 |
| 544 | 6/15/2006 | Michael Conway | 2,500.00 |
| 547 | 8/7/2006 | Michael DePinna | 1,800.00 |
| 548 | 8/19/2006 | Michael DePinna | 1,250.00 |
| 549 | 9/11/2006 | Citizens Bank[40] | 5,006.00 |

---

[38]    The court attaches little significance to Karen's paralegal experience.

[39]    It is uncontested that Michael Conway was Karen's divorce attorney. Karen testified that check ## 543 and 545 were written in lieu of reimbursement due her from Mother. (*See* 11/21/08 S.C. Tr. at 38:22–39:23  (Karen's testimony).)  The court credits that testimony.

[40]    It is uncontested that the above check was written to Citizens Bank in connection with Michael's purchase of a 2006 Ford F-150 truck.  (*See* Plaint. Exh. M; *cf. also* Case ECF No. 1 (Schedule B-Personal Property).) Michael testified that such check was written in lieu of reimbursement

| 550 | 10/4/2006 | Karen DePinna | 1,500.00 |
| 551 | 10/22/2006 | Michael DePinna | 3,000.00 |
| 552 | 1/8/2007 | Chase[41] | 2,500.00 |
| 555 | 2/24/2007 | Michael DePinna | 8,911.00 |
| | | | $34,717.00 |

(*See* Plaint. Exh. M.)

The court credits Michael's testimony that he paid for the Chair Lifts. The court also credits Karen's testimony that she paid Furnishing Costs for the Apartment in the approximate amount of $32,000.00. The court further credits Karen's testimony that the Debtors paid certain of Mother's living expenses. The court credits the Debtors' testimony that the Other Checks were written as reimbursement for the Furnishing Costs, the Chair Lifts and/or Mother's living expenses and also finds that Mother had sufficiently authorized Karen's drawing of those checks. Finally, the court credits Karen's testimony that she did not use any of Mother's money solely for Karen's own benefit. (*See* ECF No. 57 at 49:15-18 (Karen's testimony).) The aggregate amount of the Other Checks is $34,717.00. That is more than completely covered by the total of unfunded Apartment construction costs (*i.e.*, $15,000.00)[42] and the Furnishing Costs (*i.e.*, $32,000.00).[43] Under these circumstances, the

---

for the Chair Lifts. (*See* 11/20/08 S.C. Tr. at 144:1-14 (Michael's testimony).) The court credits that testimony.

[41]    Neither side has addressed the Chase check.

[42]    $188,000.00 - $173,000.00 = $15,000.00.

[43]    Mother funded Apartment construction costs and Furnishing Costs in the approximate aggregate amount of $205,000.00 which is $55,000.00 more than the original $150,000.00 estimate (which may have not included the Furnishing Costs) (*see* part II, *supra*). The court is not persuaded that the foregoing is (at worst) anything other than the result of the Debtors' innocent underestimation of costs.

foregoing is as good an accounting for the Other Checks as can be given.  Mother did not ask for an

accounting of her money until she was ready to leave.  Mother then frustrated the process by leaving

the House with the Debtors' records and putting them "somewhere" beyond both the Debtors' reach and

Mother's own recollection.  The numbers here are not exact, but Mother made a substantial contribution

to that problem herself.  On this record, the court is not persuaded that the Debtors' use of Mother's

funds as described above and the Debtors' failure precisely to account for them constitutes the requisite

"moral turpitude" under Section 523(a)(2)(A).

### 4.    The Countrywide Mortgages

The Plaintiffs point to the fact that the Debtors closed on the Countrywide Mortgages after they

were aware of the State Court Action and without making an offer of payment to the Plaintiffs.  The

short answer to that is that there was no legal impediment to that closing at the time of such closing and

the law did not then require the Debtors to assume that Mother would prevail in the State Court Action.

Moreover, the court is not persuaded that the Debtors intended to defraud Mother by means of such

closing.  If the Debtors had used the Countrywide Mortgages to access value which Mother had

contributed to the House, the result might be different.  However, that is not the case here.  That is

because the Apartment costs were reflected in the base upon which Countrywide wrote the Countrywide

Mortgages (*i.e.,* the 2007 Carbutti appraisal of the House) only to the extent of $4,725.00.  The closing

of the Countrywide Mortgages left more than that in remaining House equity (*i.e.,* at least

$30,000.00).[44]   Accordingly, the court is not persuaded that the Debtors used the Countrywide Mortgages to appropriate Mother's investment in the Apartment for themselves.[45]

For all of the foregoing reasons, the court is not persuaded that the closing of the Countrywide Mortgages constituted the requisite "moral turpitude" by the Debtors.[46]

## V.   **CONCLUSION**

The circumstances set forth above (considered either separately or in the aggregate) constitute a family tragedy; the court is not persuaded that such circumstances constitute "moral turpitude" on the Debtors' part as required by Section 523(a)(2)(A).   Accordingly, the Plaintiffs cannot prevail on their Section 523(a)(2)(A) claim of nondischargeability.   Furthermore, for the reasons discussed above, the court has determined that the Plaintiffs cannot prevail on their Section 523(a)(4) claim of nondischargeability.   A judgment determining that the State Court Judgment is a dischargeable debt in this title 11 case shall enter.

It is **SO ORDERED.**

Dated: March 24, 2011                                    BY THE COURT

                                                        *Loraine Murphy Weil*
                                                        **Lorraine Murphy Weil**
                                                        Chief United States Bankruptcy Judge

---

[44]      That number assumes that the $100,000.00 principal balance of the Valley Bank Subordinated Mortgage had not been paid down at all as of the time of the Countrywide closing.   That assumption is questionable.   (*Cf.* Case ECF No. 1 ($38,000.00 loan balance stated on the petition date).)

[45]      What is significant for this purpose is not the correctness of Mr. Carbutti's opinion of value but, rather, that Countrywide made the loans based upon that opinion rather than based upon an opinion that the Apartment added significant value to the House.   Moreover, if the Apartment was "worth" more, the House would have been worth more, and remaining equity would have increased in a like amount.

[46]      The court has considered the Plaintiffs' remaining arguments and finds and/or concludes that such arguments either are inapposite or otherwise unpersuasive.